SMITH v. UNITED STATES.

No. 1037.

United States District Court,
S. D. Texas, Houston Division.

Feb. 3, 1953.

Mandell & Wright (Arthur J. Mandell), Houston, Tex., for libellant.

Brian S. Odem, U. S. Atty., Wm. G. Winters, Jr., Asst. U. S. Atty., Royston & Rayzor (Robert Eikel), Houston, Tex., for respondent.

KENNERLY, Chief Judge.

This is a suit in Admiralty by the Administrator of the Estate of Jeff Smith, deceased, for the use of Smith's surviving father and mother, against the United States of America (for brevity called the Government) for damages alleged to have been sustained by an injury to and the death of Smith. It is claimed that such injury and death were caused by the unseaworthiness of the Steamship "Albert G. Brown" (on which Smith was a seaman and chief cook) and the negligence of those in charge of her. Libellant brings the suit under the Jones Act, Section 688, Title 46 U.S.C.A., and in Admiralty, and claims the right to sue the Government under Section 741 et seq., Title 46 U.S.C.A., and Section 1291(a), Title 50 U.S.C.A.Appendix.

Smith was, as stated, a seaman (chief cook) on the Steamship "Albert G. Brown," owned by the Government and which at the time of the alleged injury was being operated by the American Trading & Production Company. Liability by the Government is claimed under Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692.

While the Steamship was at a dock in Norfolk, Virginia, Smith while returning to the Steamship from shore leave early in the morning of September 5, 1946, undertook to climb a "carpenter's" ladder approximately 30 feet long which was lashed on the side of the Steamship, and the lashings of the ladder broke and both Smith and the ladder fell into the water. On his way down, Smith struck the dock and was injured. He died either from such injury or by drowning or both. His body was later recovered from the water.

Libellant in his brief quite clearly states the background of Smith. He gives an account of his birth and of his residence in and around Houston, Texas. I quote in the margin part of such state-

ment.[1] I adopt the part quoted as substantially correct.

Questions in the case are presented and disposed of as follows:

█ 1: The suit is brought under Section 741 et seq., Title 46 U.S.C.A., and the question of Libellant's right to proceed under those sections was raised by Respondent and heretofore determined on a Stipulation of the parties filed May 12, 1952.[2] I think, as formerly held, that such Stipulation brings the

1. Such statement is as follows:

"Young Jeff Smith was born on May 12, 1917 at Elm Park, Louisiana. He was one of eight children, seven of whom were sons and one daughter. He was the fifth child. All the boys were married with the exception of Jeff Smith. When young his parents moved to Stafford, Texas, then when Jeff was approximately sixteen or seventeen years old his parents lived way out on South Main (in Houston) on a few acres of land on which a Mr. Archer permitted them to live in exchange for watching the place. The evidence shows that young Jeff was a steady worker and kept steadily to his job. His first job after he left school was with a Mr. Sanders who owned the famous eating place known as the San Jacinto Inn on the San Jacinto Battle Grounds, and the equally famous place known as Pier 21 on Old Main Street. He kept that job until August 1, 1940 when he volunteered into the United States Navy, where he served for five years, three months and seven days. While young Jeff attended school he helped his parents by working on their farm in Stafford. After they moved to Houston he began working for Sanders as a helper in the kitchen and waiter. He regularly brought his earnings home to his mother. When young Jeff entered the Navy, in addition to the regular monthly allotment made out to them, he sent them money two and sometimes three times per month, and continued to do so until February 1945, when he was honorably discharged from the Navy. Blanche Carter and their old friend and neighbor, Charles Smith, testified to the number of times per month letters were received from young Jeff Smith with money in them while he was in the Navy, amounting to approximately One Hundred Fifty Dollars ($150.00) monthly. After Jeff was dismissed from the Navy in February, 1945, he remained home but a few short weeks and thereafter told his parents, his brothers and friends, that he was going to join the Merchant Marine because while in the Merchant Marine he would earn wages without any expense for his room and board, thus making it possible to send substantially if not all of the money home for the support of his aged and ill father and mother. He also discussed plans whereby he would be in position to buy a little home for his parents so they would not have to live in the tin shack out on old South Main which, as described his father Will Smith was 'unbearably hot in the summer and frightfully cold in the winter.' He spoke about his intention to continue supporting his aged and ill parents as long as he lived to the old friend and neighbor of their family, Charlie Smith, Blanche Carter, his brother Johnnie, and to the rest of his family. This testimony is supported by Jeff Smith's letters which refer to his sending money home. This testimony as to dependency stands uncontradicted. While in the Merchant Marine with its unusual turnover of members of the crew, the evidence shows that young Jeff sailed on one ship from March, 1945 until the fateful day of September 6, 1946, at which time under tragic circumstances he met his death. There is not one single bit or shred of evidence to contradict the testimony of the witnesses tending to show, or even raising any suspicion, that his parents, Will and Violet Smith, were in fact not dependent upon him for support."

2. Such Stipulation, omitting formal parts and exhibits, is as follows:

"It is hereby stipulated and agreed by and between the parties, hereto, acting by and through their proctors of record, that the following facts are true and correct and may be considered by the Court in connection with the respondent's motion to dismiss or for summary judgment for lack of jurisdiction:

"1.

"True and correct copies of the correspondence had between the indicated firms are attached hereto in the following exhibits:

"Exhibit 'A'—Letter from Mandell & Wright to the American Trading and Production Company dated September 26, 1946.

"Exhibit 'B'—Letter from the American Trading and Production Corp. to Mandell & Wright dated October 17, 1946.

"Exhibit 'C'—Letter from Mandell & Wright to the American Trading and Production Corp., dated October 25, 1946.

"Exhibit 'D'—Letter from Mandell &

case clearly within Section 745, Title 46 U.S.C.A. as amended December 13, 1950.[3]

2: Such Stipulation and Exhibits attached show also that Libellant's claim has been presented and administra-

Wright to the American Trading and Production Corp., dated October 26, 1946.

"Exhibit 'E'—Letter from the American Trading and Production Corp. to Mandell & Wright Dated October 31, 1946.

"Exhibit 'F'—Letter from Royston & Rayzor to Mandell & Wright dated November 5, 1946.

"2.

"On October 8, 1947, suit was filed in the District Court of Harris County for the 80th Judicial District of Texas, being cause No. D–347,955 and styled Alexander Smith, Administrator of the Estate of Jeff Smith, Deceased, vs. American Trading and Production Corp., claiming damages for the death of Jeff Smith allegedly occurring on September 5, 1946.

"3.

"On November 24, 1947, an answer was filed to this suit by Messrs. Royston & Rayzor on behalf of the defendant, American Trading and Production Corp.

"4.

"The deposition of Will Smith, the alleged beneficiary of the deceased, was taken on January 21, 1949.

"5.

"The deposition of the witness, Robert E. Mahon, was taken on March 16, 1949.

"6.

"On January 6, 1949, March 10, 1949, and October 6, 1949, conferences were had between Messrs. Mandell & Wright and Messrs. Royston & Rayzor looking toward a possible settlement of the suit against the American Trading and Production Corp.

"7.

"On May 3, 1949, the first trial amended answer of the defendant, American Trading and Production Corp. was filed by Messrs. Royston & Rayzor.

"8.

"On May 3, 1949, a jury was impaneled to try the case against the American Trading and Production Corp. in the District Court of Harris County for the 127th Judicial District of Texas, but the case was not tried at that time because of the plaintiff's withdrawal of his announcement of ready.

"9.

"On May 19, 1949, first amended original petition was filed by Messrs. Mandell & Wright in the District Court of Harris County for the 127th Judicial District of Texas.

"10.

"On May 21, 1949, the second amended answer of the defendant, American Trading and Production Corp. was filed in answer to plaintiff's first amended original petition.

"11.

"On October 9, 1950, the suit in the District Court of Harris County was dismissed by order of the Court, a true and correct copy of such order of dismissal being attached hereto as Exhibit 'G.'

"12.

"The present suit in admiralty was filed on July 5, 1951, a claim for damages by reason of the death of Jeff Smith, deceased."

"Houston, Texas, May 13, 1952.
Honorable T. M. Kennerly, Judge United States District Court
Post Office Building, Houston, Texas.

A.D.No.1037—Charlie Smith, Administrator vs. The United States of America—Our File 6792.

Dear Sir:

"At the request of Mr. Arthur Mandell of the law firm of Mandell & Wright, we are writing this letter in connection with the above matter to evidence the respondent's stipulation of this additional fact:

That at the time of the alleged injury made the basis of this suit, the American Trading & Production Corp. was serving as the general agent of the respondent in connection with the vessel on which the injury allegedly occurred.

This fact is to be considered in connection with the formal stipulations heretofore filed and if the Court prefers that it be put in a more formal form, we will be glad to do this upon receipt of your advices.

Yours faithfully,
Royston & Rayzor."

3. Section 745, Title 46 U.S.C.A., as amended, is as follows:

"Suits as authorized by this chapter may be brought only within two years after the cause of action arises: Provided, That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim: Provided further, That the limitations contained in this section for the commencement of suits shall not

tively disallowed, and that this Court has jurisdiction under the Clarification Act, Section 1291(a), Title 50 U.S.C.A. Appendix, if that Act be applicable.

▮ 3: On the issue of negligence by the Steamship and those in charge of her, I find as follows:

(a) Libellant alleges that the Steamship and those in charge of her were negligent in the following particulars:

"In failing to put out the ship's gangway for the purpose of boarding said vessel.

bar any suit against the United States brought hereunder within one year after December 13, 1950, if such suit is based upon a cause of action whereon a prior suit in admiralty or an action at law was timely commenced and was or may hereafter be dismissed solely because improperly brought against any person, partnership, association, or corporation engaged by the United States to manage and conduct the business of a vessel owned or bareboat chartered by the United States or against the master of any such vessel: And provided further, That after June 30, 1932, no interest shall be allowed on any claim prior to the time when suit on such claim is brought as authorized by section 742 of this title unless upon a contract expressly stipulating for the payment of interest."

4. Such statement is as follows:
"The SS Albert G. Brown is a government built, modern T–2 tanker of the type built during World War II. While there is no clear evidence as to when young Jeff Smith joined the Albert G. Brown, his father Will Smith did testify that he only served on one ship after he got out of the Navy, and that was the Albert G. Brown. The vessel was equipped with at least two companionways, commonly referred to as 'gangways', which consist of regular stairways leading from the vessel to the dock and vice versa and are placed sideways alongside the vessel, and if rigged in a seamanlike manner afford a complete and safe method of getting on and off the vessel. The Albert G. Brown docked sometime in the early morning of around September 3rd. or 4th., 1946, at the Standard Oil Company docks at Norfolk, Virginia. She stayed there about two or three days before this tragic occurrence took place. Yet, the Master and Officers of the vessel did not see fit to use the safe method of the companionways, which were available

"In negligently failing to have a Jacob's ladder swung from the side of the vessel so as to afford a safe means of boarding said vessel to the members of the crew of said vessel and especially to the said Jeff Smith."

The statement of the facts leading up to the death of Smith as made by Libellant in his brief is substantially correct, and same is quoted in the margin.[4] As stated therein, the Steamship had adequate and safe companionways (commonly called gangways). It in addition

to them, but used a long, approximately thirty-five (35 ') foot painter's ladder for the purpose of getting on and off the vessel. All witnesses testified that the use of a companionway affords a safe method of getting on and off the vessel, and it is so rigged up that it automatically lifts itself or lowers itself with the movement of the vessel as the cargo is discharged or loaded. That the ship's carpenter's ladder is only used when the vessel is only a few hours in port (since it takes some time to rig up the companionway). Respondent gave no explanation why it did not use the available companionway, except Rolfe's testimony stating that it saved payment of overtime.

"After the vessel lay at the dock for more than two days and on the early morning of September 6, 1946, preparatory to getting ready to put out to sea, the acting Chief Mate (the Master apparently being ashore) Jeane Raymond Rolfe gave orders to the engine room below to test the engines, i. e., rock the engines. When the engines are rocked, the vessel has a tendency to surge forward and then backward depending on the way the propellor is being turned. At the time of the rocking of the engines, Jeff Smith, with other crew members were ashore. As the engines were being rocked no gangway watch was placed at the place where the straight up and down ladder was lashed to the side of the vessel, nor were the usual precautionary measures taken of first testing the lines to see that there was sufficient slack in them so that they might not part during such operation. In any event, as the engines were rocked, the forward spring line, either by reason of its unseaworthiness or because the engines were turned with greater force than necessary or proper, broke, causing the vessel to veer away from the dock a distance of approximately six (6 ') feet, as a result of which the ladder—the only means supplied by the Respondent to

had the usual "Jacob's ladders" carried by steamships. None of these were used, however, while the Steamship was docked at Norfolk. The carpenter's ladder which fell with Smith was used exclusively there. At first it was used lashed to the Steamship and one end rested on the dock. It was unsafe. Later it was pulled off the dock and left hanging on the side of the Steamship without the end resting on the dock. It was in that position when it fell with Smith. It was unsafe. I think and find that the failure to use the "gangways" and/or the Jacob's ladders was negligence and the use of the carpenter's ladder rendered the Steamship unseaworthy. The carpenter's ladder could have been made a safe means of ingress and egress, but it was not. If it had been properly and strongly lashed to the side of the Steamship, it would have been safe either with or without the end resting on the dock.

(b) As stated, such ladder was originally not only lashed to the side of the Steamship, but one end thereof rested upon the dock. But, as stated in the margin, in maneuvering the Steamship, the end of the ladder was pulled off the dock, and at the time Smith undertook to climb it, it was not resting upon the dock at all, but hanging on the side of the Steamship. The cords which lashed the ladder to the side of the Steamship were flimsy. I do not agree that they were designed and used only to prevent the sidewise slipping of the ladder. I think and find that they were designed and used to support the ladder. Such cords, which were offered in evidence, show that they were wholly unsuited for the purpose used, and it is surprising that Respondent used them at all. Because of the flimsy cords so used to lash the ladder, it was unsafe and dangerous even if one end had rested on the dock. All this was well known to Respondent. Respondent also well knew that the ladder would likely be pulled off the dock by the maneuvering of the Steamship,

and that the ladder, supported only by the flimsy cords, would be and was dangerous. Respondent also knew that the ladder had been pulled off the dock, and was negligent in not making it safe. Respondent was negligent in failing to see to the safety of the ladder, both before and after the Steamship was maneuvered.

Libellant's charges of negligence by the Steamship and those in charge of her are well founded, and I find they were negligent as follows, which negligence proximately caused the injury to and death of Smith:

In that Jeff Smith was not provided with seaworthy lines and/or attachments so that the ladder would be safely attached or tied on to the railing of said vessel.

In that the lines with which the ladder was attached to the railing were not strong enough to hold up the weight of a person while climbing said ladder, and especially Jeff Smith.

In that the lines which held up said ladder to the railing of said vessel were old, rotten and otherwise defective thus creating a dangerous condition to anyone climbing said ladder, and especially Jeff Smith.

In failing to inspect the lines which held the ladder attached to the railing of said vessel in order to discover the defects and remedy the same.

In failing to safely secure said ladder to the railing of said vessel.

In failing to properly tie or lash said ladder to the railing of the vessel so that the lines would not give way.

In negligently securing said ladder to the railing of the vessel with defective lashing.

In negligently failing to have said ladder properly fastened to the railing of said vessel.

members of the crew such as Jeff Smith, now deceased, for boarding the vessel— slipped off the dock and hung perpendicularly alongside the vessel. The ladder

was held to the side of the vessel by two lines, and each side was made fast to the railing of the vessel and then to some cleats on the deck." etc.

In negligently failing to secure the ladder running from the dock to the vessel so that while anyone climbed said ladder, the lashing securing the ladder to the rail of said vessel would not part or give way.

■ (c) As has been stated, Respondent was required to furnish Smith with a safe means of ingress and egress. Having elected to use the carpenter's ladder, they were required to make it safe. I think and find such Steamship and those in charge of her were negligent as charged by Libellant as follows, which negligence proximately caused the injury to and death of Smith:

In that Jeff Smith was not provided with a seaworthy ladder.

In failing to provide the said Jeff Smith with a safe means by which to board said vessel.

I also find that such Steamship was unseaworthy at the time Smith fell and met his death.

4: On the issue of Smith's negligence.

Respondent charges that deceased was negligent, but does not in the pleadings point out the particular acts. It is said:

"By way of further answer, for a First Special Defense, respondent would respectfully show that if deceased was injured or died as alleged, though it is not acknowledged that deceased was so injured or did so die, such injuries and death were directly and proximately caused by the deceased's own negligent acts and omissions, or were directly and proximately caused or contributed to be caused by said negligent acts and omission, in whole or in part."

■■ Smith had the right to assume that since the ladder was furnished as his only means of leaving and returning to the Steamship, it was safe. He, of course, could see and knew that while the ladder was lashed to the side of the Steamship, the bottom of the ladder was not resting on the dock. But there is no evidence that he knew, indeed it is clear I think that he did not know, that the ladder was insecurely lashed to the side of the Steamship and with flimsy cords, as hereinbefore stated. If it be true that the cords were designed by Respondent only to prevent the ladder from sliding sidewise, Smith did not know it. He also, of course, knew that if the ladder fell with a person, it would probably mean serious injury or death for such person. There is dependable evidence that Smith was warned and that he warned others not to go upon the ladder, yet he went thereon. Smith is not here to speak for himself, and it may be that not knowing that the ladder was insecurely lashed to the Steamship, he believed that he could safely use it, but believed that others, because of their weight, lack of skill in climbing, physical or other conditions, could not do so. The evidence shows that Smith was a comparatively small man and that he was a skilled seaman, and it may be, and probably is, true that he thought that the ladder was safe for him but not for others. If the evidence showed that Smith knew of the flimsy and insecure fastening of the ladder, I would be inclined to find he was negligent in trying to use the ladder, but since the contrary is shown, I find he was not negligent.

■ 5: Libellant in his Libel (Paragraph XI) says:

"Libellant would show that the said Jeff Smith struck his head against the dock to which said vessel was berthed, that as a result thereof he suffered serious and painful injuries and then and there recognized the imminence of his falling into the water and drowning, all of which caused him extreme pain, mental anguish and untold misery, for which his estate is entitled to damages in the sum of Ten Thousand Dollars ($10,000.00)."

The record shows that Smith is dead as a result of his fall with the ladder. But it would be a mere guess to say when he died, or whether his death was caused from striking the dock or drowning or both. If the time of his death was

known and shown, there would I take it be both mental and physical suffering by him from the time he began to fall until his death. But as the record stands, the only certain period of mental and physical suffering is from the time he began to fall until he struck the dock, and the amount of damages, if any, recoverable therefor would be a mere guess. I do not think Libellant, under this record, is entitled to recover therefor.

6: I think it is reasonable to find, and I do find, that had Smith lived, he would have, between the time of his death, September 5, 1946, and this date, a period of 77 months, paid or given to his parents for their support, maintenance, etc., approximately the sum of $1,200 per year or $100 per month, aggregating $7,700. According to Stipulation filed, the life expectancy of Smith's father and mother is 8.9 years, and I, therefore, find an additional $9,233 or a total of $16,933.

Judgment will, therefore, be rendered in favor of Libellant against Respondent for $16,933, with costs of Court. Let appropriate Decree be drawn and presented.