**UNITED STATES of America, Appellant,**

v.

**Charlie SMITH, Administrator of the Estate of Jefferson Smith, Deceased, Appellee.**

**No. 14726.**

United States Court of Appeals, Fifth Circuit.

March 31, 1955.

Robert Eikel, Brian S. Odem, U. S. Atty., C. B. Smith, Asst. U. S. Atty., Houston, Tex., Malcolm R. Wilkey, U. S. Atty., Royston & Rayzor, Houston, Tex., for appellant.

Arthur J. Mandell, Houston, Tex., Mandell & Wright, Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This action by the administrator for the benefit of the parents and dependents of Jeff Smith, deceased, was brought under the Jones Act, 46 U.S.C.A. § 688, as well as under the admiralty law for unseaworthiness.[1]

A day or two before September 5, 1946, the S. S. Albert G. Brown had docked at the Standard Oil docks, a finger pier, at Norfolk, Virginia. For ingress and egress the vessel was using an upright wooden, runged ladder, like a carpenter's or painter's ladder. This was lashed at the upper end to the ship's rail with a small line, made of hemp. The lower end rested on the dock. The ship was to sail on September 5, and to check the engines they were run or "rocked". This moved the ship slightly, and either this movement or this movement coupled with the wake of a passing vessel or the tide caused the vessel's head spring line to part. The vessel swung away from the dock, and the ladder was pulled off the dock. It hung suspended, flat against the vessel's side, held only by the light lashing. The decedent, Jeff Smith, and other seamen returned to the vessel from shore leave at about this time and saw the ladder hanging against the ship's side. Smith started to climb the ladder, the lashing broke, the ladder with Smith upon it fell between the side of the ship

---

1. Appellant does not contest that an action for unseaworthiness may be joined with an action for negligence under the Jones Act. See McCarthy v. American Eastern Corporation, 3 Cir., 175 F.2d 724, 727.

and the dock, and Smith was instantly killed or drowned.

The district court held that the vessel was unseaworthy, that those in charge of her were negligent,[2] that Smith was not negligent,[3] and awarded the adminis-

2. "Libellant's charges of negligence by the Steamship and those in charge of her are well founded, and I find they were negligent as follows, which negligence proximately caused the injury to and death of Smith:

"In that Jeff Smith was not provided with seaworthy lines and/or attachments so that the ladder would be safely attached or tied on to the railing of said vessel.

"In that the lines with which the ladder was attached to the railing were not strong enough to hold up the weight of a person while climbing said ladder, and especially Jeff Smith.

"In that the lines which held up said ladder to the railing of said vessel were old, rotten, and otherwise defective thus creating a dangerous condition to anyone climbing said ladder, and especially Jeff Smith.

"In failing to inspect the lines which held the ladder attached to the railing of said vessel in order to discover the defects and remedy the same.

"In failing to safely secure said ladder to the railing of said vessel.

"In failing to properly tie or lash said ladder to the railing of the vessel so that the lines would not give way.

"In negligently securing said ladder to the railing of the vessel with defective lashing.

"In negligently failing to have said ladder properly fastened to the railing of said vessel.

"In negligently failing to secure the ladder running from the dock to the vessel so that while anyone climbed said ladder, the lashing securing the ladder to the rail of said vessel would not part or give way.

"(c) As has been stated, Respondent was required to furnish Smith with a safe means of ingress and egress. Having elected to use the carpenter's ladder, they were required to make it safe. I think and find such Steamship and those in charge of her were negligent as charged by Libellant as follows, which negligence proximately caused the injury to and death of Smith:

"In that Jeff Smith was not provided with a seaworthy ladder.

"In failing to provide the said Jeff Smith with a safe means by which to board said vessel.

"I also find that such Steamship was unseaworthy at the time Smith fell and met his death."

3. "On the issue of Smith's negligence.

"Respondent charges that deceased was negligent, but does not in the pleadings point out the particular acts. It is said:

"'By way of further answer, for a First Special Defense, respondent would respectfully show that if deceased was injured or died as alleged, though it is not acknowledged that deceased was so injured or did so die, such injuries and death were directly and proximately caused by the deceased's own negligent acts and omissions, or were directly and proximately caused or contributed to be caused by said negligent acts and omission, in whole or in part.'

"Smith had the right to assume that since the ladder was furnished as his only means of leaving and returning to the Steamship, it was safe. He, of course, could see and knew that while the ladder was lashed to the side of the Steamship, the bottom of the ladder was not resting on the dock. But there is no evidence that he knew, indeed it is clear I think that he did not know, that the ladder was insecurely lashed to the side of the Steamship and with flimsy cords, as hereinbefore stated. If it be true that the cords were designed by Respondent only to prevent the ladder from sliding sidewise, Smith did not know it. He also, of course, knew that if the ladder fell with a person, it would probably mean serious injury or death for such person. There is dependable evidence that Smith was warned and that he warned others not to go upon the ladder, yet he went thereon. Smith is not here to speak for himself, and it may be that not knowing that the ladder was insecurely lashed to the Steamship, he believed that he could safely use it, but believed that others, because of their weight, lack of skill in climbing, physical or other conditions, could not do so. The evidence shows that Smith was a comparatively small man and that he was a skilled seaman, and it may be, and probably is, true that he thought that the ladder was safe for him but not for others. If the evidence showed that Smith knew of the flimsy and insecure fastening of the ladder, I would be inclined to find he was negligent in trying to use the ladder, but since the contrary is shown, I find he was not negligent."

trator of the decedent's estate damages in the amount of $16,933.00.[4] The opinion of the district court, apparently not reported, covers some thirteen pages of the record, and only its ultimate findings have been quoted in the margin (Footnotes 2, 3 and 4, supra).

Appellant insists that the district court erred in holding the vessel unseaworthy, and those in charge negligent, in not holding Smith negligent and his negligence the sole proximate cause of his death; or if not the sole cause, in not holding that in any event the greater amount of damages should be disallowed under the rule of comparative negligence, and, finally, that the damages were excessive and contrary to the undisputed evidence.

On the issues of unseaworthiness and negligence vel non, appellant's contention is that it had not been afforded a reasonable opportunity to correct the broken spring line and to replace the ladder before the accident occurred, that the defect developed suddenly, without an opportunity to correct it. A careful reading of the record, together with an examination of part of the frayed and broken cord forwarded as an exhibit, lead us to the opinion that this contention is wholly unfounded, and that it has been adequately answered in the opinion of the district court, 121 F.Supp. 778.[5]

Appellant's main reliance seems to be on the proof tending to show that Smith was negligent. Smith was twenty-nine years old at the time of his death. He had served in the Navy for six years, and had been in the Merchant Marine aboard this same vessel for about ten months before his death. The dockmaster at this wharf testified that he warned Smith against climbing this ladder. In a statement given shortly after the accident, he had said in part: "The negro was very black and had on a blue cap with a gold 'C' on it and a white shirt and blue pants. I am satisfied it was the man I warned as there were no other negroes on the dock at that time of the morning." In his deposition introduced into evidence, he testified that " * * * I think he had a cook's cap on, if I am not mistaken." All of the other witnesses present testified that Smith had on a white hat. In his deposition, the dockmaster testified: "Well, that morning I was standing on the dock there, I was talking to two young fellows there, and then several colored fellows came up * * *." According to his previous statement, and according to the other witnesses, Smith was the only negro present. Further, the dockmaster evidenced ob-

---

4. "I think it is reasonable to find, and I do find, that had Smith lived, he would have, between the time of his death, September 5, 1946, and this date, a period of 77 months, paid or given to his parents for their support, maintenance, etc., approximately the sum of $1200 per year or $100 per month, aggregating $7700. According to Stipulation filed, the life expectancy of Smith's father and mother is 8.9 years, and I, therefore, find an additional $9233.00, or a total of $16,933.00."

5. "The carpenter's ladder could have been made a safe means of ingress and egress, but it was not. If it had been properly and strongly lashed to the side of the Steamship, it would have been safe either with or without the end resting on the dock.

* * * * * * * *

"The cords which lashed the ladder to the side of the Steamship were flimsy. I do not agree that they were designed and used only to prevent the sidewise slipping of the ladder. I think and find that they were designed and used to support the ladder. Such cords, which were offered in evidence, show that they were wholly unsuited for the purpose used, and it is surprising that Respondent used them at all. Because of the flimsy cords so used to lash the ladder, it was unsafe and dangerous even if one end had rested on the dock. All this was well known to Respondent. Respondent also well knew that the ladder would likely be pulled off the dock by the maneuvering of the Steamship, and that the ladder, supported only by the flimsy cords, would be and was dangerous. Respondents also knew that the ladder had been pulled off the dock, and was negligent in not making it safe. Respondent was negligent in failing to see to the safety of the ladder, both before and after the Steamship was maneuvered."

vious confusion and unreliability of observation when he testified differently from all other witnesses that the vessel was about forty or forty-five feet out of the water, that "he didn't remember when they switched from the ten or twelve foot ladder to the sixty foot ladder," that the sixty foot ladder sometimes stuck twenty-five feet above the ship's rail, that it weighed "somewhere around two hundred fifty to three hundred pounds, and that no living man could handle it," that the vessel veered away from the dock a distance of eighteen feet (the other witnesses placed that distance at about six feet). The dockmaster's further efforts to identify Jeff Smith as the person he had warned,[6] as well as his efforts to free the respondent from responsibility,[7] go far to convince

6. " * * * he stated that his testimony is that the boy Smith came up after the spring line had *broke* and while the vessel was probably some eighteen feet from the dock.

"He was asked this 'Now, Mr. Plass, you did not mean to leave the Court with the impression that this boy who was killed, Jeff Smith, was getting ready to jump from the dock into the ladder eighteen feet away, did you, sir?'

"He says: 'No, no.'

"Then he was asked: 'You say you told him to wait and not jump on the ladder? Is that what you told him?'

"And then Mr. Morrison, representing the respondent, stated, 'no, he said he told him not to get back on the ladder until the foot of it was put back on the dock, isn't that correct?'

"And he said: 'That is correct.'

"He was asked: 'Now, were you talking particularly to Jeff Smith?'

"And he said, 'yes'.

" 'Or to all concerned who were standing on the dock?'

"He said: 'No, I was speaking straight to him.'

" 'And why Jeff Smith in particular, sir?'

"He said: 'No particular reason. Only one reason, I seen him do it before. Not him, but I seen others do it.'

"Again he emphasized, by being asked: 'Well, Mr. Plass, let me get this picture, now. The ship was eighteen feet away from the dock, and no question but what you saw Jeff Smith was not attempting to jump that distance?'

" 'No, sure not.'

" 'And out of the clear, blue sky, you told him not to get onto the ladder until the ladder was put back on the dock?'

" 'That is right.'

" 'And you spoke particularly to Jeff Smith?'

" 'I did.'

" 'Was Jeff Smith doing anything in particular that you should address your remarks to him?'

"He said, 'no, not anything particularly, only he come up and I knew he was going to get on the ship.'

"He was asked: 'Well, there were other members of the crew of the vessel on the dock at that time who were going to get on, sir?'

"He said: 'Yes, that is right.'

"Question: 'Did you say the same thing to them, sir?'

"Answer: 'No, I don't think I did.'

" 'Why did you pick out Jeff Smith in particular and address your remarks to him?'

"Answer: 'I didn't pick him out in particular. I just happened to think he might do it. And furthermore, those young fellows were standing there before she ever went away from the dock.'

"He was asked whether it wasn't a fact that the remark he made was just addressed to several members of the crew who were assembled there, and nobody in particular; and he said, 'no, I told this fellow, Jeff Smith, just what I told you.' * * * "

7. "He says that while he was the dockmaster he had seen from time to time Jacob's ladders out, while a ship was at the pier, and he said that is correct, and that they hang perpendicularly down the side of the ship, and he said yes, and they are secured to the rail and that men climb up and down that ladder.

" 'In other words, there is no danger if the ladder is properly secured, is that right?'

"And he said: 'That is correct, if they are tied right.'

"He was then asked: 'So that we come to the conclusion, do we not, sir, Mr. Plass, that this ladder was not tied in a proper manner, is that right, sir?'

"And he said: 'I wouldn't know about that tying I never got to the tying, but I know it was put up there to do a good job.'

" 'But this particular ladder did break, did it not, Mr. Plass?'

"And he said: 'Yes, it did break.'

"Question: 'And you have seen other

us that no reliance can safely be placed on his testimony.

The dockmaster testified that he had walked away before the accident occurred. The only eyewitness offered by the respondent was Richard Oliver, a nineteen year old member of the ship's crew at the time of the accident. Oliver testified that he had started to go up the same ladder and that Smith had warned him not to do so, to wait.[8] In response to questions by the court, Oliver further testified that the ship with the ladder had moved closer to the dock when Smith attempted to climb it.[9]

Oliver had been employed as radio operator on the Albert G. Brown. James D. Burnett, an eyewitness introduced by the libellant, viewed the scene from the rail of the vessel, witnessed Smith's warning to Oliver, and testified that, when the vessel moved closer to the dock and Smith started climbing the ladder, he, the witness, thought the ladder was safe.[10] The libellant introduced Captain William Pritchett who qualified as an

ladders used in which they did not break, haven't you?'

"And he said: 'Yes, that is right.'

"He was asked: 'So it is a fair assumption or conclusion that this ladder was not tied with a line of sufficient strength, isn't that so?'

"He said: 'Well, you can take a heaving line and double it and triple it and still make a good, solid line.'

"He was asked then: 'Well, I am talking about this particular line, Mr. Plass, on September 5, 1946, at six A. M. in the morning, when the line holding the ladder broke. Do you think it is a fair assumption to say that this particular ladder was not tied or secured with line of sufficient strength to hold the ladder, sir?'

"He said: 'I don't know about that, sir. Evidently, it broke, anyway.' "

8. "Q. Now, when you came back to the ship on the morning of September 5th, about six o'clock, just tell us whom you saw on the dock there and what occurred. A. I was strolling down the dock, and I met this—this—this colored fellow, who had on a white hat and a black suit, and I spoke to him, and then I noticed that the ship was swinging away from the dock; and I learned that a spring line had parted, and that was the cause for the ship's swinging out and some of the excitement, that was caused by the spring line parting.

"And then, as the ship started to come back in, I started to go up this ladder that was hanging on the side of the ship, and this—and this colored fellow said, 'no, no! don't go up! wait!'

"So then I looked up at the ladder, and looked back, and I saw that the—what I was doing was a little dangerous.

"So then I just stepped back and I was standing there, and the next thing I looked up and this colored fellow was going up the ladder himself; and he got about half way up, and the rope holding the

ladder broke, and he just went right on down (indicating).

"Q. Did you see him come up? A. No. We ran to the edge of the dock, and the ladder came right straight back up, but there was no sign of him."

9. "Q. How long before he went up the ladder? A. I would say not more than two or three minutes.

"Q. Did he say anything before he went up? A. No (the witness shook his head).

"Q. Just went up the ladder? A. (The witness nodded his head.)

"Q. How close was the ladder to the dock when he went up? Did he have to jump to get to it or anything? A. No. There was just enough space so that when he and the ladder fell, his head and back hit the dock, just—just brushed against the dock and slid into the water.

"Q. Well, was the ladder closer to the dock when he went up than it was when you started up? A. Yes.

"Q. The ship was moving in, then? A. Yes, sir.

"Q. And it had moved in some after— A. It had moved in a little since he had warned me not to go—up the ladder.

"Q. How far was it when you started to get on? A. It—it was just enough so that I—I would have had to take a wide step to reach the rung."

10. "Q. Now after the vessel veered away and the ladder fell and was hanging perpendicularly what did the vessel do? Did it remain in that position? A. No. When it fell out it started to working its way back to the dock again.

"Q. At the time when that vessel started moving back toward the dock did you notice any member of the crew attempt to get on the ladder, or what did they do? A. Well there were three or four of the men, or there may have been five boys down on the dock. The exact number I don't know. But I know the

experienced seaman and testified that seamen often climb such ladders.[11] The testimony of William Martin Miller and that of Franklin G. Gustafson were to like effect. Gustafson testified that he had seen "in the neighborhood of fifty or one hundred" instances "* * * where seamen would climb a straight up and down ladder lashed to the side of the vessel and hanging down from the side without resting on anything".

 · The burden rested upon the respondent reasonably to satisfy the district court that the deceased Smith had been guilty of contributory negligence. United States v. Fotopulos, 9 Cir., 180 F.2d 631, 637. The district court saw and heard many of the witnesses testify orally. The scope of review here is only as to whether the findings of the district court are clearly erroneous. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6; C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850, 854. In our opinion, there was ample evidence to support the district court's finding that Smith was not negligent.

Appellant insists that the only reasonable loss of support by Smith's parents was "somewhere in the neighborhood of $50.00 per month," instead of $100.00 per month as found by the district court, and the appellee maintains, to the contrary, that the evidence could have well supported a loss of $200.00 per month. Both his mother and father were old and in bad health. While Smith was in the Navy, he made a monthly allotment to his parents of $37.00, and sent other money in letters, $30.00, $40.00, and sometimes as high as $100.00. His professed purpose in joining the Merchant Marine, communicated to his parents and their friends, was "because he believed he would be more able to help us, and he wouldn't have his clothes and his food to

---

purser and radio operator was down there, and Jeff Smith was down there, and the other boys I don't know. But they were all standing around there. And I believe the radio operator was going to jump for the ladder. The ship was out pretty far. Anyhow, they must have talked it over or something—

"Q. Just tell us what you saw. A. And it seems like Jeff Smith had warned them or had motioned for them, or had held them back from going on that ladder.

"Q. From jumping on the ladder? A. Right.

"Q. All right. At that time what did the vessel do? Did it continue to move away from the dock, or what did it do? A. It was moving in toward the dock.

"Q. Did the vessel finally get close to the dock? A. Yes, it did.

"Q. When the vessel got close to the dock what did you see Jeff Smith do? A. He got on the ladder and climbed up.

"Q. Did you or anyone else in your presence give any warning to Jeff Smith not to use that ladder? A. No, sir.

"Q. Did you have any intention of warning him not to use that ladder? A. No, sir. As far as I was concerned, I thought the ladder was safe.

"Q. Did you at that time from your experience as a seaman see anything wrong with Jeff Smith's climbing the ladder in the position it was in at that time? A. No, sir.

"Q. How far did Jeff Smith get on the ladder? A. About half way up."

11. "Q. Captain, in your experience as a seaman, while you were an unlicensed member of the crew as well as a licensed member, as well as captain, have you seen seamen climb straight up and down ladders while they were lashed to the side of the vessel? A. Yes, sir.

"Q. And while they were hanging perpendicular and without resting on anything, have you done this yourself? A. Many times I have done so.

"Q. Have you while you were an officer and master of a vessel seen seamen climb ladders while in such position? A. Yes, sir.

"Q. Did you see any cause to warn them not to climb one when it was just hanging perpendicular, just lashed to the vessel? A. There is no reason why not, no reason not to use it, because it is a safe method.

"Q. What would make that ladder, lashed as well as it may be to the railing of the vessel, hanging straight up and down, what would make it safe? A. Perpendicular to the ship or resting on the dock?

"Q. No, not resting on the dock. A. If it were secured properly at the top and the lashing of the ladder held and it were lashed so as not to drag, it would be safe under ordinary conditions."

buy, and that is why he would be able to give more support to us." At the time of his death, Smith's basic wages in the capacity of First Cook were $205.00 per month, in addition to which he received sustenance and overtime. By the time of trial, the basic monthly wages of a chief cook had been raised to $300.00. His contributions to his parents were generally sent in currency because of the inability of his parents to read and write. The mail was delivered in a box used also by some of their neighbors who would read his letters to his parents. Several of his letters are forwarded as exhibits. Two of the neighbors and his father testified in substance that the money would come usually twice a month, and in such amounts as $30.00, $40.00, $50.00, $75.00 and $100.00. We cannot say that the district court's finding of loss of support by the parents in the amount of $100.00 per month was clearly erroneous. The judgment is

Affirmed.