Edwin GUZMAN, Libelant,

v.

S. S. ROBIN MOWBRAY and Moore-Mc-Cormack Lines, Inc., Respondents,

v.

JOHN W. McGRATH CORPORATION, Respondent-Impleaded.

No. 64 Ad. 522.

United States District Court
S. D. New York.

Aug. 2, 1968.

Milton Frank, New York City, for plaintiff.

Burlingham, Underwood, Barron Wright & White, by John J. Crowley, New York City, for defendants.

Joseph F. McGoldrick, by Martin J. McHugh, New York City, for third party defendant.

## OPINION

EDELSTEIN, District Judge.

This admiralty action arose out of a fall suffered by plaintiff, Edwin Guzman, a longshoreman, on March 20, 1963, aboard the S.S. ROBIN MOWBRAY. Defendant, Moore-McCormack Lines, Inc. was the owner of the S.S. ROBIN MOWBRAY. The third-party defendant, John W. McGrath Corporation, was Guzman's employer. The jurisdiction of this court was invoked under the general admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

Edwin Guzman, then nineteen years of age, was born in Puerto Rico on May 4, 1943. He was employed as a longshoreman by John W. McGrath Corporation, and reported to work at Pier 16, Foreign Trade Zone, Staten Island, New York, at approximately 8:00 a. m. on March 20, 1963. The plaintiff, together with other members of his longshoring gang, boarded the S.S. ROBIN MOWBRAY and proceeded directly to No. 1 hatch. McGrath had three gangs working on this ship that day, all of whom were in the charge of Pier Superintendent Richard Robinson. Two of the gangs, including the one in which plaintiff worked, were assigned to hatch No. 1 and one gang was assigned to hatch No. 2. Plaintiff's gang, in the charge of Ralph Rovendro, was assigned to work the after end of No. 1 hatch. The other gang, in the charge of Mike Correo, was assigned to the forward end of that hatch.

The No. 1 hatch of the ROBIN MOWBRAY consisted of a lower hold, a lower tween deck, a shelter deck, and a weather deck. A quantity of zinc ingots which was to be discharged by these gangs was located in the lower tween deck and lower hold. Each bundle weighed about one ton. Nineteen of the bundles were stowed in the forward port side of the lower tween deck and the balance of the cargo was in the after, starboard wing of the lower tween deck and in the lower hold.

The witnesses testifying on behalf of the defendant and third party defendant would have the court believe the following story: As the longshoreman descended into the No. 1 lower tween deck a hilo, or fork lift truck, was lowered to that level to assist in the discharge operations. Correo's gang began immediately to discharge the nineteen bundles of zinc in the port forward corner of the hatch and Rovendro's gang commenced discharging the zinc located in the starboard wing of the hatch. After completing their work Correo's gang removed the two forward sections of hatch covers at the lower tween deck level in order to permit the continuation of work in the lower hold and that at the same time a net was strung athwartship adjacent to the after side of the opening created by the removal of the aforesaid covers. Correo's gang then descended into the lower hold and commenced to work. Rovendro's gang continued working in the after end of the lower tween deck. The zinc in the after end of the lower tween deck was stowed on strips of dunnage. As the zinc was removed the dunnage would be exposed and carried by the longshoreman to the forward starboard side of the ship where it was placed on top of bags of cloves which were destined for later discharge in Baltimore. In carrying out this operation, the longshoremen were required to walk with the dunnage from the after starboard wing of the vessel along the starboard side and adjacent to the open hatch, to the forward starboard corner where the cloves were located. The narrowest part of this walking area was nine feet in width and was clear and unobstructed by any foreign substance or pieces of dunnage of any kind. At about 9:00 a. m. the plaintiff mysteriously fell from a point adjacent to the starboard side of the hatch opening in the lower tween deck into the lower hold.

The testimony elicited from plaintiff, Ralph Rovendro, plaintiff's hatch boss, and from Lawrence Briggs, a longshoreman who was the "header" of plaintiff's

gang under the direction of Rovendro, however, tells a different story: After the hatch covers at the weather deck level were opened, Briggs went down into the tween deck at approximately 8:10 or 8:15 a. m. He discovered that the covers at the after end tween deck were in place but that the forward covers had been removed prior to his arrival. Briggs observed much dunnage and debris scattered all about the deck, particularly in the inshore wing area. When the other members of the gang arrived shortly thereafter and began the discharging operations, Rovendro ordered Briggs and plaintiff to remove this dunnage. This work continued for 45 to 60 minutes until the accident occurred. The dunnage boards were all different sizes but at the time of the accident Briggs and plaintiff were carrying one board which was about 12 feet long, 6 inches wide and one inch thick. Briggs took the front of the board and plaintiff the rear and the two began to proceed to the forward part of the lower tween deck. This operation required, of necessity, passing the open hatch which was devoid of any safety net. Plaintiff slipped on a small piece of wood as he passed three feet from the opening, and fell through it into the lower hold, a distance of 15 feet, sustaining serious injuries.

After considering the morass of conflicting, evasive, disjointed and confused testimony, the court, by the preponderance of the credible evidence which did emerge, is able to reconstruct the following pertinent facts: The floor of the lower tween deck was strewn with dunnage; the hatch covers on the tween deck level were off at the forward end; no adequate safety precautions were taken to guard against falls through the open hatch; and plaintiff tripped over loose dunnage and fell a distance of fifteen feet to the lower hold while removing dunnage and debris pursuant to Rovendro's orders.

 Edwin Guzman's claims of negligence and unseaworthiness are based upon the contention that respondents were negligent in failing to secure or shore the dunnage and, therefore failed to furnish him with a safe place to work, since dunnage and debris were strewn about the lower tween deck and in close proximity to an open and unprotected hatch. Rovendro, the hatch boss, testified that he had ordered the gang to remove the dunnage since the deck area was messy, thus hampering the discharging operations. Although good safety practice required the collection of loose paper, dunnage and debris in order to keep the work area clear, the hatch had to be either closed or guarded by the rigging of a safety net or railing about the hatch openings while such work was in progress. These safety precautions were not followed and libelant was injured as a proximate result of respondent's negligence and the unseaworthiness of the vessel. A shipowner owes a business guest or other invited person a safe place to work. The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Connolly v. Weyerhaeuser Steamship Co., 236 F.2d 848 (2d Cir.1956), rev'd. on other grounds sub nom. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Moore-McCormack breached its duty to Guzman, who as a longshoreman fell within the protected class, by not alleviating the conditions which they had ample time to rectify. Either the ship's officers knew or should have known of the obvious condition of the lower tween deck.

 The S.S. ROBIN MOWBRAY was unseaworthy in respect to Edwin Guzman. A shipowner's warranty of seaworthiness runs in favor of one who is performing the ship's service. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Edwin Guzman, a longshoreman, was performing the ship's service and was thus entitled to a seaworthy vessel. He did not get one. "[T]he concept of seaworthiness * * * contemplates that a ship's

hull, gear, appliances, ways, appurtenances and manning will be reasonably fit for its intended purpose." NORRIS, Maritime Personal Injuries, § 29 at p. 57 (2d ed. 1966). See also Amador v. A/S J. Ludwig Mowinckels Rederi, 224 F.2d 437, 440 (2d Cir.) cert. denied 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791 (1955). The lower tween deck where Guzman was ordered to work was not fit for its intended purpose. The deck strewn with dunnage and debris, coupled with an open unprotected hatch, rendered the vessel unseaworthy with respect to Guzman.

The failure to provide a safe and secure place to work, for which Moore-McCormack is accountable both in negligence and unseaworthiness, was the proximate cause of Guzman's fall. The untidy condition of the deck with its hatch open created the exposure to danger which resulted in Guzman's accident.

■ Moore-McCormack and John W. McGrath Corporation both alleged that the plaintiff's negligence contributed to the accident. The main claim of contributory negligence arises out of Guzman's failure to remove the dunnage immediately surrounding the open hatch or have it removed by fellow workers. The burden of showing that Guzman was contributorily negligent was on defendant and third party defendant. Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 528, 4 A.L.R.3d 517 (9th Cir.1962); United States v. Smith, 220 F.2d 548, 554 (5th Cir.1955); 2 Norris Seamen § 684 at p. 847 (1962). The preponderance of the credible evidence fails to indicate that Guzman should have acted other than how he did act under the circumstances.

Edwin Guzman was injured as a result of his fall from the lower tween deck to the lower hold, a distance of approximately fifteen feet. He was removed from the lower hold by means of a Stokes Basket and a pie plate and transported by ambulance to the Staten Island Hospital. At the hospital, Guzman came under the care of Dr. Henry A. Crane, the attending orthopedic surgeon. X-rays were taken by the hospital staff under the supervision and direction of Dr. John Beck, the director of the Department of Radiology and Dr. Crane admittedly adopted the radiologist's report. Edwin Guzman's physical examination report made at the Staten Island Hospital and admitted in evidence is dated March 20, 1963, and is over the signature of Dr. Crane. It states, inter alia, that neurologically Guzman was alert, oriented, cranial nerves grossly intact, no motor or sensory loss; the impressions of the physician at the time of admittance were cerebral concussion and possible spinal or vertebral column fracture; he ruled out tibial fracture.

While plaintiff contends that he suffered a spinal fracture which left him permanently unfit for work with permanent pain, defendant and third party defendant, however, contend that he had a pre-existing condition called a Schmorl's Node, which did not permanently disable him and did not produce permanent pain. Despite the conflicting testimony of the ten doctors who were called, it is clear that whether or not Guzman sustained a spinal fracture, he did suffer some injury to his back as a result of the fall. Whatever this injury was, fracture or no, it completely healed by February 24, 1964, when Dr. Henry C. Johnston discharged Guzman for the second time.

An examination of the hospital records and a consideration of all the testimony impels the court to conclude that Edwin Guzman did suffer injuries to his head, back and right leg as a result of his fall aboard the S.S. ROBIN MOWBRAY. He was hospitalized from March 20, 1963, the date of the accident, until May 29, 1963, a period of two months and nine days. He was treated while in the hospital with bed rest, immobilization and medication. Subsequently, he was treated by the company doctor, Dr. Henry C. Johnston, with physiotherapy, a back support, and further medication. These treatments extended over two periods of time, June 5 to November 29,

1963, and January 16 to February 24, 1964, at which point Dr. Johnston found Guzman able to resume work, and the court adopts this finding.

Guzman had been working as a longshoreman for approximately fifteen months prior to his fall. The Central Records Bureau of the New York Shipping Association, Inc. reported plaintiff's earnings which were compiled on the basis of reports received by the Bureau from the employer-members of the association. These indicate that Guzman earned $4068.69 for the year 1962 and earned $1087.26 for approximately the first quarter of 1963. These records justify the acceptance of $4200 on an annual basis as the amount upon which damages for lost earnings are to be computed. Guzman could not work from March 20, 1963, until February 24, 1964, a period slightly longer than eleven months. On the basis of $4200 yearly, eleven months and four days lost earnings amount to $3900.00. Hospitalization and medical expenses amount to $2733.45. Guzman suffered severe physical pain following the accident and thereafter for some time during the period of his recovery. Plaintiff also had to suffer the discomfort of wearing an immobilizing back brace during this period of time. Damages for pain and suffering are assessed at $10,000.00.

As the case was originally presented to the court, defendant Moore-Mc-Cormack Lines, Inc., alleged that it was entitled to indemnification from third party defendant. On the last day of trial, however, third party defendant, John W. McGrath Corporation, assumed the full burden of the defense, obviating the necessity of the court's decision on this issue.

It is the judgment of this court that Edwin Guzman recover from Moore-McCormack Lines, Inc., the sum of $16,633.45.

The foregoing constitutes the findings of fact and conclusions of law.

So ordered.